**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Shilo Walter

v.                                         Civil No. 15-cv-194-LM
                                           Opinion No. 2016 DNH 030
Carolyn W. Colvin, Acting
Commissioner, Social
Security Administration

**O R D E R**

Pursuant to 42 U.S.C. § 405(g), Shilo Walter moves to
reverse the Acting Commissioner's decision to deny her
application for Social Security disability insurance benefits,
or DIB, under Title II of the Social Security Act, 42 U.S.C. §
423, and for supplemental security income, or SSI, under Title
XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in turn, moves
for an order affirming her decision.  For the reasons that
follow, the decision of the Acting Commissioner, as announced by
the Administrative Law Judge ("ALJ") is affirmed.

**I. Standard of Review**

The applicable standard of review in this case provides, in
pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of

> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing §

405(g) as the standard of review for SSI decisions).  However,

the court "must uphold a denial of social security . . .

benefits unless 'the [Acting Commissioner] has committed a legal

or factual error in evaluating a particular claim.'" Manso-

Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per

curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Acting

Commissioner's findings of fact be supported by substantial

evidence, "[t]he substantial evidence test applies not only to

findings of basic evidentiary facts, but also to inferences and

conclusions drawn from such facts." Alexandrou v. Sullivan, 764

F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner,

360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial

evidence is 'more than [a] mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" Currier v. Sec'y of HEW, 612 F.2d

594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402

U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the

[Acting Commissioner] to determine issues of credibility and to

draw inferences from the record evidence.  Indeed, the
resolution of conflicts in the evidence is for the [Acting
Commissioner], not the courts." Irlanda Ortiz v. Sec'y of HHS,
955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citations
omitted).  Moreover, the court "must uphold the [Acting
Commissioner's] conclusion, even if the record arguably could
justify a different conclusion, so long as it is supported by
substantial evidence." Tsarelka v. Sec'y of HHS, 842 F.2d 529,
535 (1st Cir. 1988) (per curiam).  Finally, when determining
whether a decision of the Acting Commissioner is supported by
substantial evidence, the court must "review[] the evidence in
the record as a whole." Irlanda Ortiz, 955 F.2d at 769 (quoting
Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## II. Background

The parties have submitted a Joint Statement of Material
Facts.  That statement, document no. 13, is part of the court's
record and will be summarized here, rather than repeated in
full.

Walter has been diagnosed with both physical and mental
impairments including migraine headaches, carpal tunnel
syndrome, degenerative disc disease, chronic obstructive
pulmonary disease, depressive disorder, and posttraumatic stress
disorder ("PTSD") with social anxiety, panic attacks, and

3

agoraphobia.  In this section, the court focusses on three aspects of the record that are related to Walter's claims of error.

### A. Walter's Migraines

On August 25, 2011, Walter went to the emergency room complaining of a migraine headache that had lasted for three and one half days.  She was diagnosed with a "[m]igrainous-type headache, improved."  Administrative Transcript (hereinafter "Tr.") 759, 1101.  She was treated with intravenous ("IV") fluids and medication, and was discharged with Percocet.  Four days later, she saw her primary care provider, nurse practitioner Christopher Laurent, complaining of a persistent migraine.  Again, she was given IV fluids and medication.

The day after Laurent treated Walter for her migraine, she went to the emergency room and was diagnosed with respiratory failure.  Thereafter, she was intubated, transferred to another hospital, placed in a medically induced coma for 11 days, and diagnosed with Legionnaire's Disease.  Medical records generated during Walter's hospital stay refer to migraines in her medical history, but do not document any further complaints of migraines or treatment for migraines.

After Walter was discharged from the hospital, she saw Laurent at least 18 times between September 16, 2011, and May

4

22, 2012.  At none of those visits did she complain of headaches, and 17 of the 18 progress notes documenting those visits bear the notation "negative for headache."  On June 13, 2012, Walter complained to Laurent of daily headaches she called dull, mild, and "NOT the worst headache[s] [of her] life."  Tr. 865.  She also reported that her headaches were relieved by Ibuprofen, which Laurent told her to continue taking.  Then, from June 13, 2012, through July of 2013, Walter saw Laurent another 19 times, and each of the progress notes from those visits bears the notation "negative for headache."

At her hearing before the ALJ, on August 16, 2013, Walter offered the following testimony about her migraines:

> A  I'll get headaches, and I have to lay down from like, anywhere from three to five hours, and take Motrin, and have no light, no sounds.
>
> Q  And typically in the course of a month, how many of those are you going to have?
>
> A  Probably 10 in a month.
>
> Q  Okay.  So typically at least a couple a week?
>
> A  Yes.
>
> Q  Do you ever get through a month without having a migraine?
>
> A  No.
>
> Q  Do you ever get through a week without having a migraine?
>
> A  No

Q  Okay.  Have they found any medicine that made the
migraines go away?

A  No.

Tr. 46.

### B. Opinions on Walter's Physical Impairments

In April of 2012, Dr. Burton Nault, a non-examining state-agency consultant, gave an assessment of Walter's physical residual functional capacity ("RFC").[1]  He opined that Walter had various exertional, postural, and environmental limitations, but also opined that she had no manipulative limitations, i.e., no limitations in her abilities for reaching, handling, fingering, and feeling.  In July of 2013, Dr. John Ford completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical).  In it, he opined that Walter had an unlimited capacity to perform all four manipulative activities.

### C. Opinions on Walter's Mental Impairments

After Walter applied for DIB and SSI, the Social Security Administration ("SSA") determined that "[t]he evidence as a whole, both medical and non-medical, [was] not sufficient to support a decision on [Walter's] claim."  Tr. 57, 68.

---

[1] "Residual functional capacity" is a term of art that means "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1) & 416.945(a)(1).

Consequently, the SSA sent Walter to Dr. Jeffrey Kay for a
consultative psychological examination.  In a Mental Health
Evaluation Report documenting his examination, Dr. Kay diagnosed
Walter with major depressive disorder and chronic PTSD.  He did
not diagnose a personality disorder.[2]

With respect to Walter's then-current level of functioning,
Dr. Kay gave the following assessments and opinions:

**Activities of Daily Living**: She lacks energy and
motivation to carry out house cleaning and cooking
responsibilities consistently and independently.  She
relies heavily on her partner and her parents to
remind her of chores and appointments.  She is able to
care for her hygiene.  She rarely ventures out of the
house and has not regained her driver's license.  She
is unable to manage a checkbook.

**Social Functioning**: Isolating from everyone other than
family and interacting with family rarely.
Irritability is not a major problem but quite anxious
socially and has very little motivation.

**Understanding and Remembering Instructions**: MMSE [mini
mental state examination] suggests that she has no
significant difficulty with simple instructions but
the anxiety and poor memory she reports since the coma
are likely to interfere with complex instructions.

**Concentration and Task Completion**.  She was able to do
serial 7's but made one miscalculation.  She lacks the
motivation to even start housework and cooking, much

---

[2] According to the then-current edition of the DSM,
personality disorders would be listed under Axis II.  See
American Psychological Association, Diagnostic and Statistical
Manual of Mental Disorders (DSM-IV-TR) (4th ed. 2000) 29.  Under
Axis II, Dr. Kay wrote "[d]ependent traits," Tr. 795, but did
not diagnose Walter as having any of the eleven personality
disorders listed under Axis II.

less to complete it.  She needs frequent reminders and
prompts.  She has to reread or read out loud.  She is
not able to independently and consistently complete
tasks.

**Reaction to Stress, Adaptation to Work or Work-like
Situations:** Probable sleep disorder, social anxiety
and depression are likely to interfere with attendance
and punctuality.  If stressed she is likely to cry and
leave work.  Productivity will be unreliable due to
poor concentration and fatigue and low motivation as
well as pain and [shortness of breath].  She is able
to accept respectful and patient supervision.  She is
likely to be too depressed and anxious to make
decisions of any consequence.

Tr. 794-95.

In reliance upon Dr. Kay's assessments and opinions, state-
agency psychological consultant Dr. Laura Landerman performed a
psychiatric review technique ("PRT"),[3] which was reported on a
Disability Determination Explanation ("DDE") form.  While Dr.
Kay had only diagnosed depression and PTSD, Dr. Landerman
considered affective disorders (i.e., depression), anxiety
disorders (i.e., PTSD), and personality disorders when she
performed her PRT.  As best the court can tell, Dr. Landerman
considered a personality disorder in response to Dr. Kay's Axis
II observation that Walter exhibited dependent traits.

Dr. Landerman found that Walter's affective disorder and
anxiety disorder met the SSA's diagnostic criteria for those

---

[3] The SSA uses the "psychiatric review technique" to
evaluate the severity of mental impairments.  See 20 C.F.R. §§
404.1520a (describing the technique) & 416.920a (same).

mental impairments, but that her personality disorder did not. She then found that Walter had moderate restrictions in her activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence and pace; and had had no repeated episodes of decompensation.  Ultimately, Dr. Landerman determined that Walter's affective disorder was a disabling mental impairment under the criteria set out in the applicable SSA regulations.

Subsequently, Dr. Henry Schniewind of the SSA's Disability Quality Branch ("DQB") reviewed Dr. Landerman's PRT and disagreed with her finding that Walter had marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence and pace.  Accordingly, he stated that "[t]he evidence does not support a listings level psych[ological] impairment."  Tr. 798.

Because he found that Walter did not have a listings level psychological impairment, i.e., one that is disabling per se under the applicable regulations,[4] Dr. Schniewind went on to consider Walter's mental RFC:

> If we look at the objective evidence and the
> observations of the claims representative [and] the

---

[4] The SSA's listing of disabling impairments is discussed in greater detail in the section that follows.

examining source [i.e., Dr. Kay] the following MRFC
[mental RFC] assessment is supported:

A) She can understand and remember all simple
instructions.

B) From a psychological perspective (not including
fatigue that is due to her somatic conditions)[5] she is
able to carry out very simple tasks for a standard
work week with adequate pace and persistence.

C) No difficulties relating [to other people] were
observe[d].  She is able to accept supervision for
simple task completion.  She can relate appropriately
to co-workers and to the general public.

D) She can get around independently.  She lost her
driver's license for not showing up in court to pay a
fine.  She can adapt to simple and routine changes in
task assignment.

Tr. 798.

Based upon Dr. Schniewind's review, Walter's application
was returned to the SSA's Disability Determination Service
("DDS") due to an "incorrect impairment decision."  Tr. 81, 96.
A second DDE form, completed after Dr. Landerman took a second
look at Walter's application, describes the remand from the DQB
this way:

DQB Psy[chology] review . . . indicates totality of
evidence more accurately reflects presence of severe
mental impairment ([diagnosis of] adjustment
[disorder] with anxiety) with residual limitations
that would support retained unskilled work capacity .
. . .  DDS is requested to provide revised decision
reflecting Step 5/other work denial . . .

---

[5] "Somatic" means "of, relating to, or affecting the body."
Webster's Third New International Dictionary (unabridged) 2171
(1993).

Tr. 81-82, 96-97.  On remand, DDS provided a revised decision that included a new PRT by Dr. Landerman.  That PRT includes a determination that Walter had only moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  On that basis, Dr. Landerman determined that Walter did not have a listings level mental impairment.

Because Dr. Landerman determined that Walter did not have a disabling mental impairment, she went on to provide an assessment of Walter's mental RFC.  In her assessment, Dr. Landerman opined that Walter had moderate limitations in two of three abilities related to understanding and memory (and no significant limitation in the other ability in that category),[6] moderate limitations in one of eight abilities related to sustained concentration and persistence (and no significant limitation in any of the other seven abilities in that category),[7] and no limitations related to social interaction or adaptation.

---

[6] Specifically, she found that Walter was moderately limited in her ability to understand and remember very short and simple instructions and was moderately limited in her ability to understand and remember detailed instructions.

[7] Specifically, she found that Walter was moderately limited in her ability to carry out detailed instructions.

In July of 2013, Dr. Ford, the same family-practice physician who provided an opinion on Walter's physical RFC, also completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental).  Respondent appears to concede that Dr. Ford is a treating source, and the ALJ treats him as such, but the forms that Dr. Ford completed provide no information about the length or nature of his treatment relationship with Walter.  Her memorandum of law is silent on this topic. Moreover, she does not direct the court to any medical records authored by Dr. Ford, and the court has not been able to locate any in the administrative transcript.  Be that as it may, Dr. Ford opined that Walter had at least marked limitations in: one of three abilities related to understanding and memory, six of eight abilities related to sustained concentration and persistence, three of five abilities related to social interaction, and three of four abilities related to adaptation. When asked to "provide a diagnosis and a brief indication of what medical or clinical findings support[ed] [his] assessment," Tr. 1377, Dr. Ford wrote:

> Personality disorder, depression with anxiety, learning disorder, long [history] of depression [illegible] improvement.  Personality disorder not [illegible].

Id.

12

D. The ALJ's Decision

After conducting a hearing, the ALJ issued a decision that includes the following relevant findings of fact and conclusions of law:

> 3.  The claimant has the following severe impairments: depressive disorder; chronic obstructive pulmonary disease; tobacco abuse affecting her back pain and breathing); degenerative disc disease; and alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).  . . .
>
> . . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> . . . .
>
> 5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except with the ability to stand/walk for up to 2 hours.  She must avoid concentrated exposure to respiratory irritants and extreme temperatures.  She is able to occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes and scaffolds.  She is able to understand and remember simple instructions, and she is able to carry out simple tasks for a standard workweek with adequate pace and persistence.
>
> . . . .
>
> 10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Tr. 12, 13, 15, 19.  The ALJ based that conclusion on a finding that the limitations imposed by Walter's impairments "have little or no effect on the occupational base of unskilled sedentary work."  Tr. 20.  Because the ALJ found that Walter's impairments did not significantly erode the occupational base of unskilled sedentary work, she did not elicit testimony from a vocational expert ("VE").

### III. Discussion

#### A. The Legal Framework

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether Walter was under a disability from August 25, 2011, through December 23, 2013.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI benefits, an ALJ is required to employ a five-step process.  See 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

14

The steps are: 1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20 C.F.R. § 416.920).

The claimant bears the burden of proving that she is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She must do so by a preponderance of the evidence.  See Mandziej v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v. Schweiker, 530 F. Supp. 808, 810-11 (D. Mass. 1982)).  However,

[o]nce the [claimant] has met his or her burden at Step 4 to show that he or she is unable to do past work due to the significant limitation, the [Acting] Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the [claimant] can still perform.  Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982).  If the [claimant's] limitations are exclusively exertional, then the [Acting] Commissioner can meet her burden through the use of a chart contained in the Social Security regulations.  20 C.F.R. § 416.969; Medical-Vocational Guidelines, 20 C.F.R. pt. 404, subpt. P, App. 2, tables 1-3 (2001), cited in 20 C.F.R. § 416.969; Heckler v. Campbell, 461 U.S. 458 (1983). "The Grid," as it is known, consists of a matrix of the [claimant's] exertional capacity,

age, education, and work experience.  If the facts of
the [claimant's] situation fit within the Grid's
categories, the Grid "directs a conclusion as to
whether the individual is or is not disabled."  20
C.F.R. pt. 404, subpt. P, App. 2, § 200.00(a), cited
in 20 C.F.R. § 416.969.  However, if the claimant has
nonexertional limitations (such as mental, sensory, or
skin impairments, or environmental restrictions such
as an inability to tolerate dust, id. § 200(e)) that
restrict his [or her] ability to perform jobs he [or
she] would otherwise be capable of performing, then
the Grid is only a "framework to guide [the]
decision," 20 C.F.R. § 416.969a(d) (2001).  See also
Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)
(discussing use of Grid when applicant has
nonexertional limitations).

Seavey, 276 F.3d at 5 (parallel citations omitted).  Finally,

[i]n assessing a disability claim, the [Acting
Commissioner] considers objective and subjective
factors, including: (1) objective medical facts; (2)
[claimant]'s subjective claims of pain and disability
as supported by the testimony of the [claimant] or
other witness; and (3) the [claimant]'s educational
background, age, and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797

F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690

F.2d 5, 6 (1st Cir. 1982)).

    B. Walter's Claims

    Walter claims that this case should be remanded because the

ALJ: (1) erred by failing to discuss her migraine headaches

anywhere in her decision; (2) erred in determining her physical

RFC; (2) erred in determining her mental RFC; and (4) erred by

finding that the limitations resulting from her impairments had

little or no effect on the occupational base of unskilled sedentary work.  None of Walter's claims is meritorious.  The court considers each of those claims in turn.

### 1. Migraine Headaches

Walter argues that the ALJ erred by failing to deem her migraine headaches a severe impairment, at step two, and by failing to include any limitations in her RFC based upon her need to lie down for several hours at a time, one or more days a week, because of her migraines.  Respondent concedes that the ALJ does not explicitly discuss Walter's migraines in her decision, but contends that she was not obligated to do so.

Under the applicable regulations, an ALJ is obligated to "consider all evidence in [a claimant's] case record."  20 C.F.R. §§ 404.1520(a)(3) & 416.920(a)(3).  But there are many ways in which an ALJ may do so, and an ALJ is "not required to recite every piece of evidence which favor[s]" a claimant. Santiago v. Sec'y of HHS, 46 F.3d 1114, 1995 WL 30568, at *4 (1st Cir. 1995) (per curiam) (unpublished table decision) (citing Stein v. Sullivan, 966 F.2d 317, 319 (7th Cir. 1992)); see also Shaw v. Sec'y of HHS, 25 F.3d 1037, 1994 WL 251000, at *5 (1st Cir. 1994) (per curiam) (unpublished table decision).

Here, the ALJ did not: (1) determine that Walter's headaches were a severe impairment; (2) include any headache-

17

related limitations in Walter's RFC; or (3) mention headaches in her discussion of Walter's symptoms.  In fact, the ALJ said nothing about Walter's migraine headaches anywhere in her decision.

On the other hand, the ALJ prefaced her assessment of Walter's RFC with a statement that she had carefully considered the entire record.  And her discussion of Walter's symptoms generally cites Exhibit 9F, which includes records of the migraine treatment Walter received at the emergency room and from Laurent, as well as nearly 40 progress notes from Laurent bearing the notation "negative for headache."  Furthermore, the ALJ's discussion specifically cites five medical records that: (1) document complaints about a variety of conditions, but do not mention headaches; and/or (2) affirmatively state "negative for headache."

The ALJ certainly could have said more about Walter's migraines.  Even so, her "decision reveals that [she] considered the record as a whole," Santiago, 1995 WL 30568, at *4, including evidence about Walter's headaches.  Accordingly, the manner in which the ALJ considered Walter's headaches does not entitle her to a remand.

### 2. Physical RFC

Walter claims that the ALJ erred in assessing her physical RFC by ignoring Dr. Ford's opinion that she was limited in her abilities to reach, handle, finger, and feel with her upper extremities.  Dr. Ford, however, gave no such opinion.  Rather, his Medical Source Statement reports an opinion that Walker's abilities to perform those four manipulative activities were unlimited.  See Tr. 1374.  Because there is no factual basis for Walter's second claim of error, that claim necessarily fails.

### 3. Mental RFC

Walter claims that the ALJ erred in assessing her mental RFC by ignoring her personality disorder and mishandling the medical opinions.

Turning to Walter's first claim, she asserts that the ALJ erred by failing to adequately consider her personality disorder.  However, the ALJ expressly discussed both Dr. Landerman's revised PRTs and Dr. Ford's Medical Source Statement, which are among the very few documents in the administrative transcript that even use the term "personality disorder."[8]  Moreover, while Walter criticizes the ALJ for

_____

[8] The only other documents the court has located that use the term "personality disorder" are Dr. Landerman's initial PRTs, i.e., the ones that were replaced by her revised PRTs. Walter directs the court to no medical records other than Dr.

ignoring medical opinion evidence relating to the limiting effects of her personality disorder, she does so without identifying any such evidence or specifying any limitations arising from a personality disorder that the ALJ should have found, but did not.  By evaluating the opinions of Drs. Landerman and Ford, the ALJ fulfilled her responsibility to consider Walter's putative personality disorder.

Walter's second claim is that the ALJ mishandled the medical opinions contained in Dr. Landerman's initial PRTs, mishandled Dr. Ford's opinion, and proceeded impermissibly after rejecting the opinions of Drs. Kay and Ford.

Regarding Dr. Landerman's initial PRTs, Walter correctly notes the ALJ's obligation to evaluate every medical opinion in a claimant's case record.  See 20 C.F.R. §§ 404.1527(c) & 416.927(c).  She then goes on to criticize the ALJ for "completely ignor[ing] Dr. Landerman's initial findings and [giving] no explanation for preferring [Dr. Landerman's] second, rather than her first, mental RFC assessment."  Cl.'s Mot. to Reverse (doc. no. 7) 6.  Once Dr. Landerman revised her initial PRTs, however, the revised PRTs became her opinions and her initial PRTs became, at best, discarded drafts.  Whatever they

---

Ford's opinion that suggest a diagnosis of a personality disorder and none that document treatment for such a disorder.

were, they were no longer Dr. Landerman's opinions, and because
they were non-opinions by the time the ALJ reviewed Walter's
case record, she had no obligation to consider them.  That the
ALJ did not provide an evaluation of Dr. Landerman's initial
opinions gives this court no grounds for ordering a remand.

Walter also asserts, in her motion to reverse, that "[t]he
ALJ ignored Dr. Ford's finding" that her mental impairments
resulted in greater functional limitations than those assessed
by the ALJ in her decision.  Doc. no. 7, at 4-5.  In her reply
to respondent's motion to affirm, Walter makes a different
argument, not that the ALJ ignored Dr. Ford's opinion but that
she failed to give good reasons for rejecting it.  Walter's
initial argument fails because the ALJ devoted a full paragraph
of her decision to evaluating Dr. Ford's opinions, and her
second argument is not persuasive.

Under the applicable regulations, an ALJ evaluating a
medical opinion from a treating source should consider: (1) the
length of the treatment relationship and the frequency of
examination; (2) the nature and extent of the treatment
relationship; (3) the supportability of the opinion; (4) the
consistency of the opinion with the record as a whole; (5) the
specialization of the treating source; and (6) other factors.
See 20 C.F.R. §§ 404.1527(c) & 416.927(c).  Here, after

discussing the weight she gave Dr. Ford's opinion on Walter's

physical impairments, the ALJ explained her decision to give

limited weight to Dr. Ford's opinion on Walter's mental

impairments this way:

> [I]n another check-off form, [Dr. Ford] opines that
> [Walter] has difficulty in carrying out detailed
> instructions, maintaining attention and concentration
> for an 8-hour workday, maintaining regular attendance,
> as well as [in] her ability to get along with
> coworkers and maintain socially appropriate behavior.
> I have given his opinion limited weight because it is
> inconsistent with the claimant's treatment records for
> her physical and psychological impairments.  Her
> activities of daily living also show the ability to
> travel independently, and the evidence of record does
> not reflect issues in getting along with others.  Her
> medical records show cooperative behavior with good
> grooming and pleasant behavior.  In addition, I note
> that Dr. Ford is a family practitioner, and is not an
> expert in psychological treatment.

Tr. 18 (citations to the record omitted).  The court can discern

no error in the ALJ's consideration of Dr. Ford's opinion.

The ALJ gave Dr. Ford's opinion limited weight because it

was inconsistent with Walter's treatment records.  Walter

criticizes the ALJ for making "an unsupported blanket assertion"

about the inconsistency of Dr. Ford's opinion.  Cl.'s Reply

(doc. no. 14) 6.  She then criticizes the ALJ for "cit[ing] no

evidence to suggest what this unstated inconsistency might be."

Id. at 7.  However, the ALJ cites progress notes authored by

Laurent documenting pleasant cooperative behavior, which is

inconsistent with Dr. Ford's opinions that Walter has

difficulties getting along with others and maintaining socially appropriate behavior.  Thus, the ALJ gave a good reason, rooted in the regulations and based on substantial evidence, for discounting Dr. Ford's opinion.  See 20 C.F.R. §§ 404.1527(c)(4) & 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give it.").

Beyond that, while Walter criticizes the ALJ for failing to cite evidence to support her appraisal of Dr. Ford's opinion, she identifies no evidence that supports Dr. Ford's opinion. Moreover, the ALJ's statement that Dr. Ford's opinion was inconsistent with Walter's treatment records may reasonably be understood to mean both that Dr. Ford's opinion was inconsistent with Laurent's progress notes, see Tr. 828, 862, and that Dr. Ford's opinion was inconsistent with the lack of any treatment records authored by Dr. Ford.  Given that supportability is also a factor to be considered when weighing the opinion of a treating source, see 20 C.F.R. §§ 404.1527(c)(3) & 416.927(c)(3), the lack of any treatment records by Dr. Ford is also substantial evidence supporting the ALJ's decision to discount his opinion.

Walter also objects to the ALJ's reliance upon the fact that Dr. Ford is a family practitioner rather than a psychiatrist, and argues that "the ALJ's comments on activities

23

of daily living are not useful."  Cl.'s Reply (doc. no. 14) 7.
There is, however, nothing objectionable about those aspects of
the ALJ's decision.

Finally, in reliance upon Nguyen v. Chater, 172 F.3d 31
(1st Cir. 1999) (per curiam), Walter argues that after rejecting
the opinions of Drs. Kay and Ford, the ALJ impermissibly
formulated her RFC.  Walter's reliance upon Nguyen is misplaced.
In Nguyen, the ALJ rejected a medical opinion favorable to the
claimant and then formulated an RFC that was unsupported by any
other medical opinion.  See id. at 35.  The court of appeals
vacated the district court's order affirming the ALJ's decision,
and directed the district court to remand the case to the SAA on
grounds that "[t]he ALJ was not at liberty to ignore medical
evidence or substitute his own views for uncontroverted medical
opinion."  Id. (citing Rose v. Shalala, 34 F.3d 13, 18 (1st Cir.
1994); Nieves v. Sec'y of HHS, 775 F.2d 12, 14 (1st Cir. 1985);
Suarez v. Sec'y of HHS, 740 F.2d 1 (1st Cir. 1984)).  This,
however, is not a case in which an ALJ substituted her view for
an uncontroverted medical opinion.  Rather, the ALJ gave limited
weight to Dr. Ford's opinion on Walter's RFC, gave limited
weight to the opinion in Dr. Kay's Mental Health Evaluation
Report (which was not, strictly speaking, an opinion on Walter's

RFC),[9] and then formulated an RFC that relied upon Dr.
Landerman's opinion.  Nothing in <u>Nguyen</u> calls into question the
propriety of the ALJ's reliance upon Dr. Landerman's opinion.

### 4. Step Five

Walter's final claim is that the ALJ erred, at step five,
by determining, without testimony from a VE, that the
limitations she included in her RFC had "little or no effect on
the occupational base of unskilled sedentary work."  Tr. 20.
This claim is derivative of Walter's claims that the ALJ
erroneously determined her RFC.  If, indeed, the ALJ had
incorporated limitations based upon Walter's hearing testimony
about migraines into her RFC, or if Walter's RFC included the
mental limitations posited by Dr. Ford, rather than those
posited by Dr. Landerman, then perhaps the ALJ would have
required the testimony of a VE to assess the effects of those
limitations on Walter's ability to perform the full range of
unskilled sedentary work.  But because the ALJ committed no

---

[9] See <u>Dubois v. Colvin</u>, No. 14-cv-451-LM, 2015 WL 7291068,
at *4 (D.N.H. Oct. 28, 2015), <u>report and recommendation adopted
by</u> 2015 WL 7302228 (D.N.H. Nov. 18, 2015), for a discussion of
the difference between the work-related functional limitations
that form the basis of an RFC assessment and the so-called
paragraph B criteria, which "are used to assess the severity of
a mental impairment at step two, and to determine whether a
mental impairment meets or equals the severity of a listed
impairment at step three."

error in considering Walter's migraines or in evaluating the medical opinions, her RFC assessment withstands judicial scrutiny.  Thus, the court sees no error in the ALJ's determination that Walter's RFC permitted her to perform nearly the full range of unskilled sedentary work.

## IV. Conclusion

Because the ALJ committed neither a legal nor a factual error in evaluating Walter's claim, see Manso-Pizarro, 76 F.3d at 16, her motion for an order reversing the Acting Commissioner's decision, document no. 7, is denied, and the Acting Commissioner's motion for an order affirming her decision, document no. 12, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

February 18, 2016

cc:  Penelope E. Gronbeck, Esq.
     Robert J. Rabuck, Esq.